Anderson, J.
The written contract sought to be enforced by this suit, is in these words : “$8,600.—Three years after date the Virginia Porcelain and Earthenware Company, promise to pay to Thomas Calbreath, his heirs or assigns, the sum of three thousand six hundred dollars, for a steam engine, saw mill, shingle machine and chopping mill, with all the fixtures and appurtenances, which sum is to be paid in the currency used in the common business of the country, at the date of maturity, bearing interest from the date of written contract, which bears date the 3d day of March 1864.”
If this case is to be considered with our eyes closed to the condition of the country at the date of the contract, and to the surrounding circumstances, and without reference to the act of Assembly for the adjustment of ■Confederate contracts, and to the parol evidence in the record; if our view is to be narrowed down to the face of the paper, and to consider it, as we would, if it had been executed in a time of profound peace, before the war or since the war, it is unquestionably with the plaintiff. Payment would be due in Hnited States currency ; *701 that being the currency used in the common business of the country at the maturity of the contract.
But we are not restricted, nor are we at liberty to ■ . , . , , restrict ourselves, to that narrow view. W e are bound to ascertain, as far as we can, by the act aforesaid, which we have declared to be valid law, what was the true understanding and agreement of the parties as to the. kind of currency'with which the contract was solvable ; or with reference to which as a standard of value it was entered into. And to this end, we are not restricted to the evidence of the writing ; but it is our duty to consider all other relevant evidence, parol or written, direct or circumstantial, express or presumptive ; to weigh the whole together, and thence to draw our conclusions. The statute gives no direction, as to the weight to be given to each kind of evidence, except only it implies, that written evidence, or evidence in writing under seal, is not conclusive. The court must consider all, and give to each just such weight as, in its opinion, it is entitled to; and decide, according to its belief, what was the true understanding and agreement of the parties. If they believe, from a consideration of the whole case, that the real intention of the parties was different from what the writing imports on its face, they are bound to give effect to it, and not to the contract as evidenced by the writing. But I do not hesitate to say, that where the contract is in writing, and plainly and expressly discloses the intention of the parties, and there is no evidence of fraud or mistake, it would require very strong evidence to satisfy my mind, that the intention was contrary to that which the writing clearly expresses.
The contract in this case expresses, that payment was to be made three years after date, “ in the currency used in the common business of the country at the date of maturity.” But it does not express that United States currency was meant. It contains not a word or syllable repugnant to the natural presumption, that they meant
*702 the currency of their own government; and did not mean the' currency of an alien enemy—a circulation was inhibited by penal statute. The writing then -n ^.g cage (joeg n0j. p|appy an(j expressly disclose an ^ntenti0EL the parties, that in any event, payment should be made in United States currency.
In Hilb v. Peyton, not yet reported, the contract, as construed by a majority of the court, 'is substantially the same as this. As construed, it was to pay two years after date, in such funds as the banks received and paid out at maturity. It is true that, in my opinion, it was susceptible of a construction, on its face, which required payment to be made in such funds as they received and paid out at the date.of the bond. But a majority of the ' court construed it to mean at its maturity. Taking that to be the import of the bond, the majority of the whole •court held that the contract was solvable in Confederate currency, although the banks were receiving and paying out at its maturity, United States currency. Both the contract in this case and in that, are in effect solvable in the currency used in the common business of the country at their maturity respectively.
I hold it to be a sound principle, that where parties under the government of Virginia, made a contract during the war, especially if made after the 20th of October 1863, with reference to Confederate money, as the standard of value, payable at a future fixed period, in such currency as was the medium of exchange in the -transactions of the country at the maturity of the contract, the presumption is, in the absence of evidence to the contrary, that they intended payment in Confederate currency. Indeed, by the act of 14th of October 1863, fairly construed, all contracts made on or after the 20th of October of that year, were presumed to be made with reference to Confederate currency as a standard of value, and solvable in the same kind of currency, unless a contrary intendment was .expressed. It was a conclusive *703 presumption of law. But now since the adjustment act of March 3d, 1866, as expounded by this' court in Walker’s per. rep. v. Pierce, 21 Gratt. 722, the presumption is not conclusive, but only prima facie.
Again, I hold it to be equally clear, that the war re-suiting before the maturity of the contract, in the extinction of Confederate currency, and in the introduction of the currency of the country which at the date of the contract was an alien enemy, cannot change that presumption as to the intention of the parties in their contract.
This principle is not in conflict with Boulware v. Newton. It was there held that parties during the war, had a right to contract with reference to the contingency that the war might result in the overthrow of the Confederacy, and in that event payment to be made in United States currency. The principle now asserted, does not deny the right to make such a contract. It only declares that in a certain state of facts it shall not be presumed. But on the contrary, that the presumption is, in such ease, that payment shall be made in Confederate currency ; and that the war terminating before the contract matured, and destroying that currency, could not change the contract of the parties. This it seems to me is sound in law and reason.
Now let us apply it to the case in hand. This contract was made in March 1864, during the war; at a time when every true man within our borders felt that although we were engaged in a death struggle for liberty and independence, and for the life of the Confederacy, it would be nothing short of moral treason, to think of surrendering our Confederation, and restoring the old government. It was a contract for the sale and purchase of property ; price, $3,600, payable at a fixed time in the future, three years after date, in “ the currency used in the common business of the country at the date of maturity.” According to the principle enuuciated, if *704 this contract was made with reference to Confederate currency a$ the standard of value, and it is not expressed in the writing, or proved by other evidence, that there was .a different intention, the presumption is, that it was intention to be paid in Confederate currency. And the war having terminated disastrously before it was solvable, extinguishing the Confederate currency and introducing in its place and stead, a currency which was foreign to the parties at the date of the contract, and which was the currency of the alien enemy, it could not change the contract of the parties, and subject the debtor to pay in the substituted curi’ency (United States) more than the value of the Confederate currency with reference to which the pi’ice was fixed in the contract.-
The question now alises, was this contract, made the 3d day of March 1864, entered into with reference to Confederate money as the standard of value ? Such was the presumption of law at the date of the contract, by force of the act of Assembly of October 14, 1863, unless a different intendment is expressed; though now by the act of March 3, 1866, either party may offer evidence to repel that presumption, and to show what was the true understanding. It is now only a prima facie presumption.
There is nothing in the writing to repel this prima facie presumption. It throws no light upon this inquiry. It describes the property sold “a steam engine, saw mill, shingle machine and chopping mill, with all the fixtures and appurtenances.” It states the price $3,600, payable thi’ee years after date, with interest from date, and gives the date March 3d, 1864. Is there anything in the surrounding circumstances, or in the pai’ol evidence, to .repel this prima facie presumption, which is raised by the statute with regard to all contracts made on or after the 20th of October 1863 i
It is in proof that at the date of the contract Confederate money constituted the only currency, a fact which *705 is judicially known. That fact is not in'opposition to, but in support of, the prima facie presumption under the statute, and doubtless was inducement to the passage of the act.
There is also proof as to the value of the property. It is conflicting and contradictory. Accoi’ding to repeated decisions of this court, the appellate tribunal in such case will presume that the judgment of the court of trial, who had the witnesses before it and heard their testimony, as to the weight of evidence, is correct. And according to the judgment of the County court, which is affirmed by the Circuit court, the value of the property at the date of the contract was $1,400. I could not say, from the evidence certified, that it was undervalued. On the contrary, the evidence, I think, sustains the judgment of the County court as to the value of the property.
But the plaintiff’ and defendant in their contract valued it at $3,600. What sort of dollars did they mean ? Certainly not gold dollars. It is equally evident that they did not fix the price in greenbacks. There was no such currency in Virginia outside of the enemy’s lines, and its circulation was prohibited by penal statute. The only currency that was in circulation was Confederate. And it being evident that the price was not fixed in gold dollars, or in greenback dollars, as the standard of value, the price must have been fixed with reference to Confederate currency as the standard of value.
This conclusion cannot be avoided by the fact that the gold value of $3,600 at the time was greatly below the value of the property. It is a fact of general notoriety, that in contracts of sale, &c., Confederate money had a much higher value than the brokers’ tables indicate. Hence it is, that the adjustment act was amended and the property value was allowed in contracts of sale, renting and hiring. As was pertinently said by Moncure, P., in Hale v. Wilkinson, 21 Gratt. 75, *706 88, “Confederate money had a purchasing power in regard to land and other property, which made it worth much more than its market value in gold with the brokers.” And he cites with approbation what was said arguendo in Thorington v. Smith, “while it was 20, 80 or 40 to 1, those treasury notes had an exchangeable power of 2, 8 or 4 to 1 in the different species of property.” The fact, therefore, that the gold value of the price to be paid for the property was greatly below its value does not avoid the conclusion to which we had come, that the price was fixed with reference to Confederate currency as a standard, nor repel the prima facie presumption to that effect raised by the statute.
Is there • anything iu the parol evidence to repel the presumption, fortified as it is by the facts which we have been considering? The witnesses, John J. Bell and T. "W. Shelton, who were the agents of the company in making the contract, both testify that they contracted with reference to Confederate money as the standard. That they.never thought of any other, and had no authority to contract for any other, and supposed that plaintiff’ had reference to Confederate money. Their testimony is in exact harmony with the presumption raised by the statute, and the conclusion drawn from the facts which we have been considering. The plaintiff’s testimony on this point is not contradictory. It is true he says that he considered the contract purely one of risk and hazard, and that he expected the currency to be better at the maturity of the contract than it was at its date, &c.; which we will after a while consider; but he nowhere says that the contract was not made, or the price fixed, with reference to Confederate money as the standard. There is no evidence in the record in conflict with the testimony of Bell and Shelton on this point. I am, therefore, brought irresistibly to the conclusion that this contract was made with reference to Confederate money as the standard of value.
*707 This fact now being established according to the first postulate, it was intended to be paid in Confederate currency, unless a different intention is shown by the writing or by other evidence.
"We have already shown that there is nothing in the writing which expresses an intention that payment should in any event be made in United States currency. "We will now inquire whether there is anything in the nature of the contract, or its phraseology, which repels the natural presumption that a contract for the sale and purchase of property, in which the price of the property was fixed with reference to Confederate currency, was intended to be solvable in the same kind of currency, and not in a foreign currency which, at the time of the contract, was the currency of an alien enemy, and which was prohibited by the laws of the State to which the contracting parties belonged. It is contended that the phraseology employed in the writing, “to be paid in the currency used in the common business of the country at the date of maturity,” implies that it might be a different currency from that then in use. And so it may. But it does not imply that the parties meant United States currency. If it was shown by the paper, or the other evidence in the record, that it was a contract of hazard, contingent upon the termination of the war before its maturity, and the overthrow of the Confederacy with its currency, such evidence would be sufficient to repel the presumption, as natural and strong as it is, as well as the now prima facie presumption of the statute, that the parties intended payment to be made in the same kind of currency, with reference to which as the standard of value the contract was made. I cannot now conceive of any mere presumptive evidence which could repel that presumption. Nothing less than an express agreement shown by the writing, or implied in terms which would give it the force of an express agreement, or proved by the clearest and most unquestionable testi *708 mony, would be sufficient to repel the presumption of the sfofote and of the facts in the case.
An act of the Confederate Congress had iust passed . . . . . = . n ,. providing for calling m the circulation, and tor the issue a new c1irrency for two-thirds of its nominal value jm its stead. And the parties would probably expect that other and more radical changes might be made by the Confederate government iu the currency before their contract matured, and therefore say, that it shall be paid in the currency then (at maturity) used in the common business of the country. It does not imply that it shall be the currency of the enemy with whom their State was then at war, against the presumption that, in’ fixing the price of the property in their contract with reference to Confederate currency, they intended it to be paid in the same kind of currency, and also against the presumption of the statute which was in force at the date of their contract, and which was then conclusive. But the effect of the act of March 3, 1866, is to allow either party to show by other evidence that the fact was not as the law then presumed. But if that is not shown, I apprehend the presumption raised by the statute is as conclusive as it was before the subsequent act was passed.
The phraseology employed was also proper if the parties intended to repel the common law presumption, that it was a contract for specie. This was unnecessary under the act of Assembly, supra. But still they may have deemed it safest to express it in their written contract. There is nothing on the face of this paper which, in my opinión, removes the strong presumption from the law and the surrounding facts, that the parties intended payment to be made in Confederate currency.
Such, therefore, was .the contract, unless the parol evidence shows otherwise. The parol evidence consists, on behalf of the defendant, of two witnesses; and on the plaintiff’s behalf, of his own testimony. The notion, or opinion of his witness, Z. F. Calbreath, that it was a *709 contract of hazard, nothing having been said on the subject in his hearing, is not entitled to consideration. The defendant’s witnesses are entirely consistent; andas they understood the contract, it was made with reference to Confederate money, as the standard of value, and was to be performed and fulfilled in Confederate currency. Their testimony is imperfect harmony with, and fully sustains, the presumptions relied on. There is nothing in the record to throw a doubt upon their capacity, or credibility; and it does not appear, that they have auy interest in the subject of controversy. They were the agents of the company in making the contract; and both of them testify, that they would not have purchased the property to be paid for in any other currency than Confederate. They say that the price of the property was fixed with reference to Confederate money, and was to be paid for in Confederate money, as they understood it. That they thought of no other ; that none other was mentioned ; that they would have contracted for no other, and had no authority to contract for any other. That nothing was expressly said to them by the plaintiff, or by them to the plaintiff, with reference to the kind of money to be paid in discharge of the obligation. One of them says, the question was not discussed between them, but he supposed that plaintiff’ had reference to Confederate money, as none other was talked about, and he himself thought of no other, and that the paper sued on expressed the true understanding and agreement of the parties, as it was understood by him. It is true, that one of them says, he offered to pay the plaintiff at once, and that he refused, saying he preferred the terms of the contract; for what reason he does not appear to have stated. He does not say that he was unwilling to receive Confederate money; or that he ■expected to get paid in a better currency than Confederate. It may be implied, that he expected to get a better Conf'ederaté currency, at the maturity of the *710 bond, than that which was then circulating, as an act had recently passed the Confederate Congress, and which was soon to go into operation, which would subject the holders of Confederate treasury notes to a loss of one-third of their nominal amount. This factitself furnishes sufficient and adequate motive for his refusing to receive payment down ; and in addition, he may then have had no use for the money, and preferred to have it at interest. "Whatever may have been his motive, it is not shown that he was unwilling to receive Confederate money, or that he expected to receive payment in greenbacks. He did not intimate it at the time, nor does he expressly say now, in his deposition, that he did. Doubtless he expected to be paid in a better currency than that which was then offered him, which he knew would be reduced in a short time, to two-thirds of its face value ; and in this aspect of the case he had good reason to say, that he preferred the terms of his contract.
It seems to me, that if the plaintiff intended to bind the defendant to pay in a different currency than that in reference to which the price of the property was fixed, and_.which was then the only currency of the country ; if he intended to bind him to pay in "United States currency, in any event, it should have been so expressed in the bond ; or at least he should have disclosed in some way, such intention and purpose. As I said in Lindsey v. Stover's ex'or, “I am unwilling to hold parties bound to pay in United States currency, dollar for dollar, for property purchased during the war, at Confederate prices, and when Confederate money was the only currency of the country, unless the evidence clearly shows, that it was in the contemplation of the parties when they made the contract, and was their intention that in some contingency, payment should be made in United States currency.” That I hold to be a just, and sound principle. And it finds support in the case of Thorington v. Smith, 8 Wall. U. S. R. p. 1, 12 and 13. In that *711 case it was held by the Supreme Court of the United States, Chief Justice Chase delivering the opinion of the court, that where a contract was made in any other country, whose circulation denominated dollars, was of inferior value to the coins or notes authorized in the United States, in a suit brought upon that, contract here, the creditor could only recover the equivalent value in lawful money of the United States ; so where the contract was made between the inhabitants of the Confedel’ate States, when Confederate treasury notes were the exclusive currency of the country, and when, what he calls, the “insui’gent belligerent power was actually established as the government of the country,” such a contract “must be interpreted and enforced with reference to the condition of things created by the acts of the governing power.” Again, the chief justice says: “In the light of those facts it seems hardly less than absurd to say, that these dollars (nominated in a Confederate contract), must be regarded as identical in kind and value, with the dollars which constitute the money of the United States.”
Contracts made under such circumstances, and with reference to Confederate money, as the staudard, are prima fade contracts solvable in Confederate money. In this case, the agents of the company had the right so to regard it, as a contrary intention had not been expressed by the plaintiff in the negotiation, or in the written agreement. And the plaintiff ought to have understood it in the same way, without any declaration on the part of the agents that they so understood it. It was not imcumbent on the agents to have expressed what would have been universally understood at the time and under the circumstances ; and they say that they never thought of any other currency.
The plaintiff testifies that he understood it to be purely a contract of hazard or risk ; and that the writing expresses the true understanding and agreement. But we *712 have seen that the paper -writing does not purport to be a C0Qb’act of hazard, contingent upon the termination of the war and its results. He does not say that he even expected it to be paid, m any event, in Hmted States currency. But says “ he had no idea what would be the currency of the country at the time of the maturity of the obligation, but chose to run the risk, &c. But if such were his thoughts and expectations they were not manifested to the agents of the defendant, by the writing, or in any other way.
The plaintiff has, therefore;- failed to prove, by parol or other relevant evidence, any thing which can repel-the presumption arising upon the face of the written contract, read in the light of the surrounding circumstances, that it was a contract made in reference to and solvablein a Confederate currency. The parol evidence, so far from repelling, strengthens and confirms that presumption.
It is very hard for us to give up long established habits of thought. We are slow to admit innovations. And as we advance in years, we are apt to become more fixed in our habits of thought, as well as other habits, which become hallowed by time ; and we become more and more averse to change and innovation. We have been so long accustomed to the rules of law, distinguishing between the different grades of evidence, and attaching such verity and sanctity to some descriptions, as absolutely excluding any explanation or contradiction by other evidence, that it is hard to turn our minds into a different channel. How the acts of adjustment, supra, are innovations. They overturn some important rules of evidence in relation to contracts for the payment of money made between the 1st day of January 1862 and the 10th day of April 1865. In Hilb v. Peyton a ma- ■ jority of the court held that under this act parol or other relevant evidence was admissible, in relation to all contracts made between those periods, whether in writing *713 under seal or not under seal, as the means of understanding what was the true understanding and agreement of the parties as to the kind of currency in which they were solvable, or- with reference to which as a standard of value.they were made. That decision, I take it, settles the construction of the statute ; and it is no longer an open question. And as thus judicially construed, the law requires us to consider this writing, in connection with the other evidence of the contract. The error, I think, arises from regarding the writing as the contract, when it is only evidence of it; and the parol is really as legal evidence of it as the writing. "We are obliged to consider the whole together. To do so, if we believe Shelton and Bell, it is not possible to believe that the defendant ever made such a contract as the plaintiff claims. And. their testimony is not in conflict with the writing. Take both together, can there be a doubt that the defendant did not make a contract to pay in other currency than Confederate ? I care not what were the thoughts or expectations of the plaintiff', confined to his own breast, it is not a contract binding on the defendant, without his assent to it. Regarding this evidence of the defendant’s agents, did they ever assent to a contract for their principal except for Confederate money ? They both testify that they never did. Then, as there can be no contract without the assent of both parties to it, the plaintiff has failed to establish the contract under which his counsel contend he has a right to recover. Aud if such contract were specially alleged in his declaration, he could not recover at all, except upon the quantum valebat count.
The plaintiff ought to get the value of his property, lie ought not to desire more. At least the defendant should not be held'to a contract of hazard and speculation, which, it is evident, he never made, nor intended to make. I think the judgment of the County court, affirmed by the judgment of the Circuit court for Au *714 gusta county, conforms to the substantial justice of the-case and the law. If we were not satisfied that the j cdgment is correct, we should not reverse except for a plain deviation from the law or evidence. Much respect is due to the judgment of the court of trial. Upon thewkole, ^ am °f opinion to .affirm the judgment of the Circuit court.